## PEOPLE *v.* SAUERBIER.

1. HOMICIDE—MANSLAUGHTER — TRIAL—CRIMINAL LAW—CHARGE.
   Respondent, who was convicted of manslaughter committed after an altercation in which the parties decided to go into the country and fight it out, respondent striking deceased soon afterwards and knocking him down, was not prejudiced by the charge of the court that if he acted in self-defense, fearing great bodily harm or danger to life, he should be acquitted; and the instructions were not open to the objection that they confused the issue, for if they were inapplicable on the ground that the parties were engaged in carrying out an unlawful purpose, the instructions were not harmful.[1]

2. SAME—ASSAULT DURING PERPETRATION OF UNLAWFUL ACT.
   The fact that respondent prepared himself for the fight, and attempted to carry out the unlawful purpose, warranted a conviction of the offense.

3. SAME—MURDER IN SECOND DEGREE.
   Upon expert testimony that the injuries found upon the deceased victim of the assault could not have been produced by a blow of the fist or fall on the sidewalk, and that respondent surreptitiously left the scene immediately after the assault, returning in a few minutes, sufficiently justified the court in submitting to the jury the question whether the crime amounted to murder in the second degree.

4. SAME—REQUESTS—TRIAL.
   Nor did the court err in refusing to give several requests in the exact language used, where he instructed the jury fully, covering the same ground in the general charge.

5. SAME—DISTINCTION AS TO OFFENSES—INSTRUCTIONS.
   It was error to instruct the jury that the practical difference between the two offenses was the length of the maximum penalty, but a verdict finding respondent guilty of the lesser offense rendered the instruction harmless.

---

[1] On the question of the standpoint of determination as to danger and necessity to kill in self-defense, see note in 3 L. R. A. (N. S.) 535.

For insulting words or conduct as a provocation to homicide, see note in 4 L. R. A. (N. S.) 154.

6. SAME—TRIAL—FURTHER INSTRUCTIONS.
     The court was not in error in limiting further instructions
     asked for by the jurors, subsequent to their retiring, to the
     points desired by them, without instructing them a second
     time as to the matters of self-defense, or of reasonable doubt,
     that had been covered in the charge.

7. TRIAL—CRIMINAL LAW.
     It was within the discretion of the court to refuse to commu-
     nicate to counsel for the accused the contents of a written
     communication sent to him by one of the jurors through an
     official of the court: his action in taking no notice of the
     matter was proper, and so long as he did not hold communi-
     cation with any of the jury, respondent suffered no preju-
     dice.

Exceptions before sentence from Berrien; Bridgman,
J. Submitted November 15, 1912. (Docket No. 6.)
Decided January 3, 1913.

Walter Sauerbier was convicted of manslaughter.
Affirmed.

*Roger I. Wykes*, Attorney General, and *William H.
Andrews*, Prosecuting Attorney, for the people.

*Coolidge, Riford & White*, for defendant.

McALVAY, J.   Respondent was prosecuted in the cir-
cuit court for Berrien county upon an information in which
he was charged with the crime of murder.   The trial re-
sulted in a verdict against him of manslaughter.   The
case is before this court on exceptions before sentence.

There is little dispute in the testimony in the case upon
the circumstances surrounding this homicide.   On Novem-
ber 21, 1911, deceased, Gilson Crumb, who lived at Col-
oma, a village located about 10 miles from Benton Har-
bor, went in the afternoon with another man  to Benton
Harbor, where they visited some saloons and drank some
beer.   Between 10 and 11 o'clock that night they went to-
gether to the street car station in Benton  Harbor, for the
purpose of taking the electric interurban car to Coloma.

That evening respondent and two companions came from St. Joseph to Benton Harbor by street car, about the hour of 7 o'clock, where they also visited saloons and drank some whisky and considerable beer. They arrived at the street car station after deceased and his companion, for the purpose of taking the car back to St. Joseph. When they arrived at this station, deceased and two or three others were standing on the cement sidewalk in front of the station, near the storm door. Soon after arriving there respondent in some manner became engaged in conversation with deceased and his companion, during which each expressed a willingness to engage in a fight, and deceased called respondent a vile name. Respondent suggested that there was too much light to fight at that place, and they went down the street about 10 or 15 rods, where it was quite dark. All the others remained on the sidewalk in front of the station. The witnesses could not see what these parties did while they were together, and the only statement of what occurred is that of respondent, who says deceased desired to fight him, and started to strike him, but that he held him and talked him out of the idea of fighting. They came back in a short time to the station and joined their companions. Soon after deceased used some vile language, claimed to be directed to respondent, stating, "If he will go out into the country, I will lick him." Soon after this respondent went into the street car station, as he testifies, thinking from deceased's remarks that he desired to go out into the country, and that he went into the station for the purpose of taking off his overcoat, and to go with him and fight him. When respondent went through the storm door, deceased stood at the side or near it. He at once took off his overcoat, and said to the station agent, " I am either going to give him a licking or take a licking." He then came out of the station, through the same door, and immediately struck deceased with his left fist a blow somewhere upon his head, which knocked him down upon his back, causing unconsciousness from which he never recovered. He was

first carried into the station, and later removed to a doctor's office and afterwards to a hospital in Benton Harbor, where he died during the next day.

There is some dispute in the testimony as to what occurred just before the blow was struck. There is agreement that deceased was still standing on the sidewalk near the door, on the right-hand side. A witness who came with respondent testifies that as he came out of the door deceased called him a vile name and raised his hand as if to strike, and then respondent struck him. Respondent testifies to the same thing, and that he thought deceased was about to strike him. All the other witnesses testify that as respondent came out of the door deceased called him a vile name, but made no attempt to strike him, and that when respondent struck him deceased's hands were either down at his side or in his pockets. All the eyewitnesses agree that the blow was a swinging blow, but none of them located with certainty the place where it struck him. On the sidewalk where deceased fell were three blood spots of considerable size, which came from the wound in the head of deceased. An examination of deceased immediately after he was knocked down, and later at the doctor's office, in the hospital, and at the post mortem, disclosed a wound in the occipital portion of the skull on the right side, about an inch and a half from the middle line, just below the occipital prominence, about an inch long, tending slightly upward and inward toward the left. It was an incised wound, and the scalp was cut slanting upwards. It extended through the scalp and also through the periosteum into the bone. No other place was discovered on the face or the body showing evidence of a blow or injury, although it was examined for that purpose. Two fractures were found in the base of the skull, from which death resulted. The record shows testimony of at least one of the attending physicians that, in his opinion, the wound found upon the head of deceased could not have been made with the naked fist, nor by falling backwards upon an ordinary cement sidewalk.

The errors relied upon by respondent and discussed in his brief will be considered. It is insisted that in the charge to the jury the court did not properly submit the question of self-defense, claimed by respondent. On the part of the people, it is claimed that there was no element of self-defense in the case, and, even if there was evidence warranting the submission of the question of self-defense to the jury, it was fully and fairly submitted by the trial court.

The testimony of respondent was that the blow he struck deceased at that time was justified, as he claims, on account of his fear of him, and that at the time deceased appeared to be about to strike him. He also testifies that he went into the station for the purpose of removing his overcoat to go out and fight deceased, saying to the station agent, "I am either going to give him a licking or take a licking," and went out at once, and dealt the blow as soon as he got through the door. The entire defense is that the blow with the fist was struck in self-defense, based by respondent upon the fact that he was in fear of deceased and thought he was about to strike him. Respondent's claim is that the fracture of the skull and consequent death of Crumb was the result of striking his head upon the cement walk when he was knocked down by respondent.

The charge of the court upon the matter of self-defense, which is claimed by the respondent was prejudicial and erroneous, is as follows:

"The defendant claims that he was in fear, and struck the blow that caused the death of Gilson Crumb in self-defense. The law gives to every person the right to protect himself from an unlawful assault. * * * Where assault is made, or attempted to be made, or a person honestly believes that an assault is about to be made upon him, the right to resist exists, but the resistance must be in proportion to the danger which is apprehended. If, however, the person assailed honestly believes his life is in danger, or that he may receive serious bodily harm, he has a right to resist, even to tak-

ing the life of the assailant. The person assailed is to be judged by the circumstances and conditions as they honestly appeared to him at the time. It is for you to say, considering his actions as told by himself, in going down the street with Gilson Crumb, in going in to the interurban station and returning at the time and in the manner he did, his statement concerning his fear and his intent, and what he said and did, taken together with all the other evidence in the case, whether the respondent honestly believed he was in danger of losing his life, or in danger of great bodily harm, or that an assault was about to be made upon him, and that it was necessary to strike Crumb in the manner he did in order to save himself from such apparent and threatened danger. Although you may not be satisfied that the respondent, in committing the act, acted in self-defense, still, if the testimony in this case creates in your minds a reasonable doubt as to whether or not the act was done in self-defense, the respondent is entitled to the benefit of the doubt, and it will be your duty to acquit him."

If the question of self-defense, under the facts in this case, was a proper one to be submitted to the jury, which we do not here determine, the charge above quoted was not prejudicial to respondent, and no error can be predicated upon it.

The complaint made to this portion of the charge is not that the law as given was not correctly stated, but upon the ground that it was inappropriate to this case and confused the jury, and that the jury was left to infer that if the respondent was in fear of his life or of great bodily harm at the hands of deceased he was guilty at least of manslaughter; and this upon the theory that there was nothing in the case to warrant the court in charging the jury as if respondent, under any circumstances, could be convicted of manslaughter. This necessarily is closely connected with the second contention urged by respondent that the court erred in the instant case in charging the jury as to the law applicable to murder and voluntary manslaughter, for the reason that there was no evidence that the killing was voluntary or intentional.

There is no dispute but that respondent prepared him-

self to fight deceased out in the country, as he claims, or that at the time he struck this blow he was on his way to carry out that purpose. It is not claimed that it was a lawful purpose, and from respondent's testimony it is evident that his intention was to carry the fight to a finish. Proceeding to the execution of this intention, clearly formed, his claim is that at the door of the station he struck deceased in self-defense, because he called him a vile name and appeared to be about to strike him. The verdict of the jury has disposed of the question of fact upon this proposition, contrary to respondent's contention, and it therefore requires no further consideration.

In urging that the court erred in instructing the jury as to murder in the second degree, because there was no evidence in the case to warrant it, the testimony of some of the physicians as to the nature of the wound through the scalp and into the skull, and also their opinion that such a wound could not have been caused by a blow with the naked fist, or by falling backward upon the cement sidewalk has evidently been overlooked. This testimony, taken in connection with the undisputed fact that respondent, very soon after deceased was knocked down by him, went back into the station and asked the station agent if he could get out the back way, and was let out by him through the back door, which was kept locked, and very soon came around from the back of the station, was for the jury to consider as a question of disputed fact, and which warranted the court in charging as he did upon the law applicable to murder in the second degree.

The respondent contends that the court erred in not giving certain of these requests to charge in words exactly as presented. This court has of recent years held that, as a general rule, where the law has been clearly and correctly stated by the trial court in the charge as given, a refusal to give such requests in the exact words as presented will not be error. This rule applies to the instant case.

The jury, after retiring, returned to the courtroom

twice for further instructions upon the matter of provocation, and also as to the distinction between murder and manslaughter. Colloquies of considerable length were held between the court and counsel, and the court finally charged the jury upon these matters, practically repeating what had already been given under the subjects in the former charge.

Upon the first return of the jury into the courtroom, it is apparent from what was said that the questions upon which further instructions were desired were as above stated, and upon these instructions given by the court at the time no error is assigned, except as to the matter of reasonable doubt. The record does not show a request on the part of the jury for such instructions, and the charge already given upon the question of a reasonable doubt was a proper one.

When the jury were again before the court asking for instructions, the court gave further instructions upon the same questions, to which counsel for respondent have excepted, as to what was said relative to provocation. It will be of no benefit to state all that was said upon this matter, but it appears that the court repeated substantially what he had already correctly given as to provocation.

In his charge to the jury at that time, relative to the distinction between murder in the second degree and manslaughter, the court at length stated the law correctly, and no exception was taken. A statement was then added that the practical difference was one of maximum penalty, and it is urged that this was prejudicial to defendant and constituted reversible error. This statement was not correct, and should not have been made in the instant case. However, we do not think that it was prejudicial. The verdict of the jury found respondent guilty of manslaughter, and his counsel recognize in their brief and argument the rule that respondent cannot complain of such error, where the result is a conviction of the minor offense.

At no time did the jury ask the court for further instructions upon the question of self-defense. The complaint is not made on the part of respondent on the ground that no such instruction was given. In our opinion the court properly confined these later instructions to matters requested by the jury, and from the result it appears that the respondent was not prejudiced.

After the jury retired for the last time to deliberate on a verdict, and while the court was in session, and in presence of both counsel, the court officer handed a paper to the court, and the record shows as follows:

"*Mr. Riford:* (Counsel for Respondent): Is that a communication from the jury?

"*The Court:* Yes.

"*Mr. Riford:* I think we are entitled to know what that communication is from the jury.

"*The Court:* I think not.

"*Mr. Riford:* The circuit judge on the bench has received a communication from the jury. Counsel for respondent respectfully asks the court to know what that is, and the court respectfully declines, and we take an exception."

Error is assigned upon the refusal of the trial court to state the communication sent in by the jury. No statement was made by the court to any person of the nature of this communication; nor was any communication sent by the court in answer thereto. No authorities are cited in support of the contention of respondent, and this court has been unable to find any directly in point. There are authorities which hold that a court may not communicate with a jury after it has retired to deliberate, or in the absence and without the consent of counsel go before the jury for the purpose of instruction. In the instant case the court did not communicate with the jury. It is evident that the jury, or some member of it, communicated upon some matter, in writing, with the court. This was voluntary, and a matter which was not within the control of the court, and apparently was not a request for further

173 MICH.—34.

instructions. Whatever it was, the learned trial judge, without divulging the matter, paid no attention to it. In our opinion this was a reasonable exercise of his judicial discretion. Nothing prejudicial to the respondent appears from this communication, and no error was committed.

We find no prejudicial error in this case. The conviction is affirmed, and the court below is directed to proceed to judgment.

STEERE, C. J., and MOORE, BROOKE, STONE, OSTRANDER, and BIRD, JJ., concurred. KUHN, J., did not sit.